FILED
2013 APR -1  AM 10: 10

CLAUDA MATHEWS
POINSETT CO. CIRCUIT CLERK

IN THE CIRCUIT COURT OF POINSETT COUNTY, ARKANSAS
CIVIL DIVISION

LORA CROTZER, as Administrator of the
ESTATE OF GAYLON RAY KARNES, DECEASED                   PLAINTIFF

VS.                             CIV 2013-39 (VH)

CHS, INC.; and JOHN DOES I-X                            DEFENDANTS

## COMPLAINT

Comes now the Plaintiff, Lora Crotzer, as Administrator of the Estate of Gaylon Ray Karnes, Deceased, by and through her attorneys Wilcox & Lacy, PLC and Scholtens & Averitt, PLC, and for her Complaint against CHS, Inc., and John Does I-X, states:

### PARTIES

1. This case arises from the personal injuries and resulting death of Gaylon Ray Karnes, who while an invitee and pedestrian at Defendant's facility, was run down from behind and crushed by a thirty-six thousand pound front-end loader operated by Defendant's employee during this course and scope of his employment. Gaylon Ray Karnes was a resident of Poinsett County, Arkansas at the time of his injuries and death on January 19, 2013. He lived most of his life in Poinsett County.

2. Lora Crotzer is a resident of Trumann, Poinsett County, Arkansas and has been appointed Administrator of the Estate of Gaylon Ray Karnes by the Probate Court of Poinsett County, Arkansas. Ms. Crotzer is authorized to bring this action. See Exhibit 1.

3. CHS, Inc. is a Minnesota Corporation, headquartered at 5500 Cenex Drive, Inver Grove Heights, Minnesota 55077, that does substantial business in the State of Arkansas. CHS, Inc. markets fuels, gasoline and distillate products in Arkansas. CHS, Inc. also markets and sells crop nutrients in Arkansas using a Little Rock, Arkansas river terminal. CHS, Inc. also markets and sells crop nutrients to Arkansas companies and residents through its Mississippi river terminal on the Tennessee side of the Mississippi river.

4. Defendants John Does I-X are individuals and/or entities who may have owned the facility in question, were responsible for the safe operation of the facility, or employed one or more of the persons, including Wayne Nichols, present and providing services at the facility on the day in question. CHS, Inc.'s corporate structure includes multiple and varying relationships with other companies, subsidiaries and cooperatives who may be responsible for the harm suffered either by agreement or by operation of law. Despite due diligence of counsel, the identity of these individuals and/or entities remain unknown. See Exhibit 2.

## JURISDICTION AND VENUE

5. CHS, Inc. is an agricultural company that emerged as a result of the merger of Cenex, Inc. and Harvest States Cooperatives in 1998. Among other things, CHS, Inc. provides agricultural inputs such as fuels, farm supplies, crop nutrients and crop protection products. CHS, Inc. has systematic and continuous contacts with the citizens of Arkansas and has derived substantial economic benefit therefrom since, at the very least, 1998.

6. This Court has personal jurisdiction over the parties. Gaylon Karnes was an Arkansas resident at the time of his death and the Probate Proceeding has been initiated in Poinsett county, Arkansas. CHS, Inc. conducts business in the State of Arkansas to the extent necessary to satisfy all State and Federal requirements for personal jurisdiction. In 2012, CHS, Inc.'s total annual revenues were $40.6 billion. CHS, Inc. markets fuels, gasoline and distillate products in Arkansas. CHS, Inc. also markets and sells crop nutrients in Arkansas using a Little Rock, Arkansas river terminal. CHS, Inc. also markets and sells crop nutrients to Arkansas companies and residents through its Mississippi river terminal on the Tennessee side of the river. Thus, CHS, Inc. conducts and operates business in Arkansas and has substantial contacts with the State of Arkansas through

these operations such that maintenance of this action does not offend traditional notions of fair play and substantial justice. Defendant's conduct and connections with Arkansas are such that Defendant should reasonably anticipate being haled into court in this State. In fact, Defendants has brought numerous lawsuits as a Plaintiff in the Courts of this State. Defendant has also purposely directed its activities at Arkansas residents, and this litigation results from injuries arising out of, or relating to, those activities. CHS, Inc. is, therefore, subject to personal jurisdiction in Arkansas.

7. This Court has jurisdiction over the subject matter of this action as this is an action arising from personal injury sustained by an Arkansas resident and wrongful death and survival pursuant to Ark. Code Ann. § 16-62-101 and § 16-62-102.

8. Venue properly lies in Poinsett County, Arkansas pursuant to Ark. Code Ann. §§ 16-55-213, 16-60-112; Wright v. Centerpoint Energy Res. Corp., 372 Ark. 330, 276 S.W.3d 253 (2008), as both Mr. Karnes and Ms. Crotzer were residents of Poinsett County, Arkansas at the time of Mr. Karnes' death, and Ms. Crotzer was appointed Administrator of the Estate of Gaylon Ray Karnes by the Probate Court of Poinsett County, Arkansas. Additionally, all known eye witnesses to the incident giving rise to this lawsuit reside in the Northeastern portion of the State of Arkansas.

## FACTS

9. Paragraphs 1 through 8 are incorporated by reference as if set forth fully herein.

10. Prior to his death, Gaylon Karnes was a truck driver employed by Johnston Trucking, Inc. in Jonesboro, Arkansas.

11. On January 8, 2013, Mr. Karnes was dispatched from Arkansas to the CHS facility located at President's Island, in Memphis, Tennessee to pick up a load of fertilizer for Jimmy Sanders, Inc.'s Bowman/Lake City, Arkansas location. At one point, President's Island was the

3

largest island on the Mississippi River located between Tennessee and Arkansas. In the 1940's, the island was converted to a peninsula with a harbor on the Tennessee side of the river. The area was later transformed into an industrial center and annexed by the City of Memphis.

12. Mr. Karnes arrived at the CHS facility and proceeded to area where vehicles are loaded by a CHS employee with a front end loader.

13. CHS designed the traffic flow patterns and loading operation at its Memphis facility. CHS made no effort to designate pedestrian pathways or to control traffic routes. The loading operation at the CHS facility was designed and organized in a manner which caused a foreseeable and unreasonable risk of harm to pedestrians, particularly truck drivers. The routing of the trucks through the facility required the product to be loaded from the passenger side of the tractor-trailer via a stationary hopper/conveyor system. In turn, the hopper was required to be loaded multiple times during a single sale via a thirty-six thousand pound front end loader. Because the hopper/conveyor was stationary, the truck driver was required to monitor the load as the conveyor filled the trailer.

14. Due to the absence of any alternative method used by the facility, a tractor trailer driver was required to exit his or her vehicle and walk to a raised area and observe the loading process to ensure that the product did not overflow the walls of the trailer. Upon observation, and as appropriate, the driver would then return to his vehicle and move the tractor trailer forward or backward, often multiple times during a single sale, to ensure an even load and to prevent spillage. Due to the visual obstruction of the tractor-trailer itself, the front end loader operator and the truck driver could not see one another during the loading process while the truck driver was outside of the vehicle.

15. The CHS facility is designed to have three separate loading operations occurring simultaneously involving at least three front end loaders. The loading process and flow of traffic was designed without identified pedestrian pathways and, in fact, was designed to result in pedestrians crossing heavy equipment, high traffic and congested areas without instruction, restriction or warning.

16. Unlike other similar facilities, CHS was understaffed and did not use spotters or signal persons, radio systems, or other means of communication which would have removed the necessity for drivers to exit their vehicles and monitor their loads. Such spotters should have been employed by CHS to monitor the loading of the vehicles and to monitor the interaction between pedestrians and CHS vehicles.

17. Unlike other similar facilities, CHS made no effort to designate pedestrian pathways or to control traffic routes (i.e. arrows, yield/stop signs, barriers, etc.).

18. CHS did not provide Mr. Nichols with a monitoring or radio device that would allow him to communicate directly with Mr. Karnes while he was inside of his vehicle.

19. Due to under-staffing, CHS did not provide any employees to serve as spotters, or signal persons, in the CHS yard or to monitor the activity of CHS drivers, loaders, conveyors or other personnel or equipment.

20. Upon information and belief, following the death of Mr. Karnes, CHS has implemented a system whereby the loading process is completed without the driver of the tractor trailer exiting the vehicle. CHS now instructs drivers not to exit their vehicles and provides employees to serve as monitors and spotters.

21. At the time of the accident, drivers, such as Mr. Karnes, who picked up loads at the CHS facility were expected and required to exit their vehicles to monitor the loading of their trailers. The drivers were responsible for observing the loading of their trucks to ensure the loading of their trucks complied with DOT regulations and so as to prevent safety hazards and/or spillage. As required, Mr. Karnes was outside of his vehicle at the time of the incident described herein.

22. On January 8, 2013, Mr. Nichols, an employee of CHS, was operating Defendant's John Deere 624 front end loader. The vehicle' tires are about five feet high and two feet wide. The machine weighs approximately thirty-five thousand pounds and stands about fifteen to eighteen feet high. It is capable of picking up eight to ten thousand pounds of load at one time.

23. The operator's manual which accompanied the John Deere 624K required Mr. Nichols to very carefully read the entire operator's manual and to be qualified by supervised training and instruction.

24. The operator's manual required Mr. Nichols to be familiar with the job site and surrounding areas before operating the vehicle.

25. The operator's manual required Mr. Nichols to know and observe all safety rules that may apply to every work situation and work site.

26. The operator's manual required Mr. Nichols to keep bystanders/pedestrians clear at all times.

27. The operator's manual required Mr. Nichols to use barricades or a signal person to keep vehicles and pedestrians away.

28. The operator's manual required Mr. Nichols to use a signal person when using the machine in a congested area or where visibility was restricted.

29. The operator's manual required Mr. Nichols to always keep the signal person in view.

30. The operator's manual required Mr. Nichols to carry loads close to the ground to aid visibility.

31. Upon delivery of the front end loader to CHS, John Deere instructed CHS to require operators to read, understand, and comply with the operator's manual.

32. Upon delivery of the front end loader to CHS, John Deere instructed CHS to train and supervise operators as to the safe operation of the machinery, specifically including safe operation so as to prevent injury to bystanders or pedestrians.

33. On the day of the accident, the CHS loader/operator, Wayne Eric Nichols was in the process of loading the fertilizer into the hopper. Under this hopper was the conveyor which transferred the fertilizer to Mr. Karnes' trailer.

34. During this process, Mr. Karnes noted that the front hopper of his trailer was full and that the load was off balance on the back hopper. This was a common occurrence at this facility and required Mr. Karnes to move the vehicle forward in order to allow for an even load and to prevent the fertilizer from spilling over the trailer and onto the ground. It was also required to comply with various axle weight requirements imposed by government regulations. After moving the vehicle forward, Mr. Karnes returned to the platform outside of his vehicle where he could monitor the loading of his trailer.

35. Thereafter, Mr. Karnes was required to again return to the vehicle and to move the trailer backward in order to allow for an even load and to prevent the fertilizer from spilling over the trailer and onto the ground. After moving the vehicle backward, Mr. Karnes again exited the cab of his truck by opening the door and climbing down the ladder while facing the cab of the truck. When

he stepped onto the ground, he turned to his right and started to walk back to the platform to continue to monitor the loading of his trailer.

36. Also at this time, Mr. Nichols had delivered his last load into the box and had completed his part of the loading process of Mr. Karnes' trailer. The entire loading process had taken place on the passenger side of Mr. Karnes' vehicle. There was no communication that would have informed Mr. Karnes that Mr. Nichols had completed the loading process and would be immediately thereafter driving through the pedestrian zone.

37. Due to the operation of heavy equipment and loading systems, the noise level at the CHS facility is in such a range so as to prevent a person from distinguishing the overall environmental sounds from the operation of an individual piece of equipment, such as a front end loader.

38. Unbeknownst to Mr. Karnes, Mr. Nichols began to drive the Defendant's front end loader around the front of Mr. Karnes' vehicle and along its driver's side.

39. Mr. Nichols was driving the vehicle with the bucket raised and in such a manner so that the bucket obstructed his view.

40. Mr. Nichols has admitted that he did not see Mr. Karnes before the accident. He was driving the vehicle at approximately 5-8 mph.

41. The noise level at the CHS yard prevented Mr. Karnes from hearing the front end loader approaching him from behind, and he was unaware of its presence.

42. Defendant's driver had the empty bucket at a height of approximately 5 feet at the bottom of the bucket. Mr. Karnes was approximately 5'9" tall.

43.   Mr. Karnes proceeded walking away from his truck and towards the platform approximately 20-25 feet. At that time, the lower portion of the bucket of Defendant's front end loader struck Mr. Karnes in his head, knocking him to the ground. Thereafter, Mr. Nichols continued to drive the vehicle forward, and ran over Mr. Karnes' torso and legs with the left vehicle's front tire. He then continued driving another seventy feet to the next vehicle in line behind Mr. Karnes' vehicle, either oblivious to or ignoring the fact that he had struck Mr. Karnes in the head with his raised bucket and then run over his prone body after he had been knocked to the ground.

44.   When Mr. Nichols arrived at the next vehicle, the driver of that vehicle advised him that he had run Mr. Karnes down from behind. This driver and another eye witness to this accident are both residents and citizens of the State of Arkansas, who reside near Poinsett County.

45.   CHS, Inc.'s traffic flow design and loading procedure for loading trucks gave rise to an unreasonable risk of harm to business invitees such as Mr. Karnes, and CHS, Inc.'s facility did not have the appropriate safety protocols in place to prevent this type of accident.

46.   After the accident, Mr. Karnes was conscious and coherent. He was able to move his legs and he knew his name. However, within a few minutes, Mr. Karnes was no longer able to move his legs and was not able to remember his name.

47.   Upon arrival, the first responders noted that Mr. Karnes was unresponsive and pale and was suffering obvious trauma and deformity to his right pelvis.

48.   Mr. Karnes was emergently transported to the Regional Medical Center where he was taken to the critical care unit.

49.   Mr. Karnes suffered a crushed pelvis, severe abdominal bleeding and complete urethral disruption. He underwent an exploratory laparotomy and was transferred to trauma ICU.

9

43.   Mr. Karnes proceeded walking away from his truck and towards the platform approximately 20-25 feet. At that time, the lower portion of the bucket of Defendant's front end loader struck Mr. Karnes in his head, knocking him to the ground. Thereafter, Mr. Nichols continued to drive the vehicle forward, and ran over Mr. Karnes' torso and legs with the left vehicle's front tire. He then continued driving another seventy feet to the next vehicle in line behind Mr. Karnes' vehicle, either oblivious to or ignoring the fact that he had struck Mr. Karnes in the head with his raised bucket and then run over his prone body after he had been knocked to the ground.

44.   When Mr. Nichols arrived at the next vehicle, the driver of that vehicle advised him that he had run Mr. Karnes down from behind. This driver and another eye witness to this accident are both residents and citizens of the State of Arkansas, who reside near Poinsett County.

45.   CHS, Inc.'s traffic flow design and loading procedure for loading trucks gave rise to an unreasonable risk of harm to business invitees such as Mr. Karnes, and CHS, Inc.'s facility did not have the appropriate safety protocols in place to prevent this type of accident.

46.   After the accident, Mr. Karnes was conscious and coherent. He was able to move his legs and he knew his name. However, within a few minutes, Mr. Karnes was no longer able to move his legs and was not able to remember his name.

47.   Upon arrival, the first responders noted that Mr. Karnes was unresponsive and pale and was suffering obvious trauma and deformity to his right pelvis.

48.   Mr. Karnes was emergently transported to the Regional Medical Center where he was taken to the critical care unit.

49.   Mr. Karnes suffered a crushed pelvis, severe abdominal bleeding and complete urethral disruption. He underwent an exploratory laparotomy and was transferred to trauma ICU.

50. On January 9, Mr. Karnes was returned to the operating room for fasciotomy on his left thigh.

51. On January 10, Mr. Karnes was returned to the operating room for an exploration of his abdomen. An end colostomy was performed, and Mr. Karnes had his tacks removed. Mr. Karnes' fascia was then closed and packing was reapplied to his soft tissue wounds around his pelvis. Also, he was equipped with a urethral catheter.

52. Mr. Karnes was transferred back to trauma ICU where he experienced poor urine output and other complications. He also required vasopressor and ventilator support during this time. Mr. Karnes then began experiencing jaundice, and it was discovered that he had a swollen gallbladder with sludge.

53. On January 17, Mr. Karnes was returned to the operating room for massive debridement.

54. On January 18, Mr. Karnes underwent another massive debridement removing a vast majority of the muscles on his left thigh and pelvis. During this time, Mr. Karnes continued to require major vasopressor support.

55. Mr. Karnes died at 12:55 p.m. on January 19, 2013.

56. Upon discharge, it was noted that Mr. Karnes had suffered from a rectal injury, an urethral injury, a grade 2 spleen injury, right L3 and L5 transverse process fractures, an L5 spinous process fracture, right 4, 5, 11, and 12 rib fractures, left 6, 7 and 11 rib fractures, bilateral superior and inferior pubic ramus fractures, a left acetabular fracture, a bilateral zone 1 sacral fracture with massive pelvic soft tissue wounds and a cardiopulmonary arrest.

57. While hospitalized, Mr. Karnes underwent surgical procedures on January 8, 9, 10, 17 and 18, and received 105 units of blood. Due to his medical condition, Mr. Karnes could not be fully sedated during these procedures which caused him to suffer even more pain and suffering than that which already would be expected for these types of injuries and interventions.

58. Mr. Karnes' death were the direct result of his the injuries received in above-described accident.

59. Mr. Karnes was 69 years old at the time of his death, and he had lived most of his lifetime in Trumann Arkansas.

60. The total expenses associated with Mr. Karnes' medical treatment are anticipated to be in excess of $700,000.00 The total expenses associated with Mr. Karnes' funeral were $7,105.71.

61. Plaintiff reserves the right to amend this Complaint following discovery, including the identification of additional defendants.

## COUNT ONE: NEGLIGENCE

62. Paragraphs 1 through 61 are incorporated herein as set forth herein word for word.

63. CHS had a duty to design and organize the loading operation at its Memphis facility in a manner which would avoid any foreseeable and unreasonable risks of harm to pedestrians, particularly truck drivers. CHS was negligent in the design of its facility and the organization of its loading operation. Alternatively, CHS recklessly disregarded the obvious risks of harm to pedestrians that resulted from the design and operation of its facility. The routing of the trucks through the facility required the product to be loaded from the passenger side of the tractor-trailer via a stationary hopper/conveyor system. In turn, the hopper was required to be loaded multiple times during a single sale via a thirty-six thousand pound front end loader. Because the

hopper/conveyor was stationary, the truck driver was required to monitor the load as the conveyor filled the trailer.

64. Mr. Karnes traveled upon Defendant's premises for a purpose connected with Defendant's business. Mr. Karnes was a business invitee upon Defendant's premises. Defendant owed Mr. Karnes a duty to use ordinary care to maintain its premises in a reasonably safe condition and free from dangerous activities. Defendant also owed a duty to use ordinary care to protect Mr. Karnes from those dangerous conditions and activities which, with reasonable care, it should have discovered.

65. The dangerous conditions and activities present upon Defendant's premises were not known or obvious to Mr. Karnes, and Defendant should reasonably have anticipated that Mr. Karnes would be exposed to these dangerous conditions and activities. Defendant had a duty to warn Mr. Karnes of the dangerous conditions and activities present upon its premises.

66. Mr. Karnes was required to encounter these dangerous conditions and activities in order to perform his job. Defendant benefitted financially through the performance of Mr. Karnes' job on its premises.

67. Defendant had the duty to exercise reasonable and ordinary care to operate its facility in such a way as to avoid, and/or guard against, the type of accident described herein. This includes, but is not limited to, establishing policies and procedures regarding when drivers are to be outside of their vehicles, providing employees who are designated as spotters or signal persons, providing monitoring or radio devices that allow the drivers of Defendant's machines to communicate directly with the drivers, providing barriers, markings, pathways or other pedestrian/traffic control devices, or having other types of protocols to prevent this type of vehicle-pedestrian accident.

68. At the time of this incident, at the CHS facility, drivers were allowed and required to walk freely in the yard as the trucks were being loaded. Drivers were also not provided with reflective vests during these times that they would be pedestrians who were crossing heavy equipment, high traffic and congested areas.

69. Because CHS was understaffed and did not have any employees who were designated spotters, or signal persons, drivers were required to be outside of their vehicles to watch the loading of the trucks.

70. Drivers, such as Mr. Karnes, who picked up loads at the CHS facility were expected and required to exit their vehicles to monitor the loading of their trailers. The drivers were responsible for watching and monitoring the proper loading of their trucks. Mr. Karnes was doing his job and was outside of his vehicle at the time of the incident described herein.

71. CHS did not provide Mr. Nichols with any type of monitoring or radio device that would allow him to communicate directly with Mr. Karnes or the other drivers. This lack of radio device or other appropriate protocol is what caused Mr. Nichols to drive on Mr. Karnes' driver's side and to approach the truck behind Mr. Karnes' trailer.

72. CHS was understaffed and did not provide any employees to serve as spotters or signal persons, in the CHS yard or to monitor the activity of CHS drivers, loaders, conveyors or other personnel or equipment.

73. At the time of this incident, CHS, Inc.'s facility did not have any safety protocols in place to prevent this type of accident. Upon information and belief, CHS has implemented such protocols after this incident in an attempt to prevent future accidents and fatalities.

74. Mr. Karnes was entitled to assume that Defendant would use reasonable care in the operation of its facility and that Defendant's employee would use reasonable care in the operation of the front end loader. Defendant failed to use reasonable and ordinary care and, in fact, acted unreasonably and negligently in the operation of its facility. Defendant's employee failed to use reasonable and ordinary care and, in fact, acted unreasonably and negligently in the operation of Defendant's front end loader.

75. Defendant's negligence includes, but is not limited to, the following:

>Failing to design and organize the traffic flow patterns and loading operations at its Memphis facility in a manner which would avoid any foreseeable and unreasonable risks of harm to pedestrians, particularly truck drivers;

>Being understaffed and failing to provide employees who are designated spotters or signal persons, to monitor the activity of CHS drivers, loaders, conveyors or other personnel or equipment;

>Failing to provide their drivers with any type of monitoring or radio device that would allow him to communicate directly with the drivers of their customers' whose vehicles are being loaded;

>Failing to provide any other protocols designed to prevent this type of accident;

>Failing to instruct drivers not to exit their vehicles during the loading process and to warn drivers of the hazards of doing so (to the contrary, Defendant required drivers to exit their vehicles during the loading process);

>Failing to provide drivers with reflective vests during times that they would be pedestrians who were crossing heavy equipment, high traffic and congested areas.

>Lack of proper training and implementation of safety procedures to prevent occurrences of the type which caused the injuries to and ultimate death of Mr. Karnes;

> Failing to train its employee as to the method of safely operating the front-end loader and to require him to comply with the instructions contained in the operator's manul;
>
> Failing to adequately supervise its employee in the operation of the front-end loader;
>
> Lack of proper screening of its employees whom it entrusted to operate its machinery.
>
> Use of inadequate, substandard machinery;
>
> Failure to warn customers such as Mr. Karnes of a known dangerous condition in its yard; and
>
> Failing to otherwise to act reasonably under the circumstances as described throughout this Complaint.

76. Mr. Nichols was a CHS employee at the time of the events giving rise to this lawsuit, was acting within the scope of that employment, and was operating Defendant's equipment on Defendant's property and servicing Defendant's customers. Mr. Nichols was engaged in the activity which had been assigned to him by Defendant and which may reasonable be said to have been contemplated as a part of his employment and was in furtherance of CHS's interest. The vehicle driven by Mr. Nichols was owned by Defendant, and Mr. Nichols was a regular employee of Defendant. As such, CHS is also vicariously liable for the negligence of its employee, Mr. Nichols.

77. As the driver of Defendant's front-end loader, Mr. Nichols had the duty to drive with reasonable care. He also had a duty to keep a lookout for persons standing or walking at Defendant's facility; to keep Defendant's vehicle under control; to see and be aware of what was in his view; to use reasonable care to avoid an accident and to drive at a speed no greater than is reasonable and prudent under the circumstances, having due regard for any actual or potential hazards. He also had a duty to operate the vehicle in the manner prescribed by the Manufacturer and in a manner that

allowed him to view the area of persons or objects in his path of travel. If Mr. Nichols could not view the area of persons or objects in his path of travel, he had a duty to discontinue driving the vehicle until he could regain his view or obtain the assistance of a spotter.

78. Mr. Nichols breached these duties and was negligent in the operation of Defendant's vehicle. He drove the vehicle in a manner that obstructed his view in an area in which he knew or should have known that Mr. Karnes and/or other pedestrians would be walking. He also drove the vehicle at an excessive speed under the circumstances. Mr. Nichols had a duty to use reasonable care in the operation of Defendant's vehicle and breached this duty leading to the injuries and death of Mr. Karnes.

79. The entrustment of the front end loader by Defendant to Mr. Nichols created an appreciable risk of harm to Mr. Karnes and a relational duty on the part of Defendant.

80. Upon information and belief, Defendant was negligent in the hiring of Mr. Nichols in that it failed to take adequate precautions to determine his past history and propensity to subject third parties to an unreasonable risk of harm.

81. Upon information and belief, after discovering evidence of Mr. Nichols' propensity to subject third parties to an unreasonable risk of harm, Defendant was negligent in retaining Mr. Nichols as an employee.

82. Upon information and belief, Defendant was negligent in that it failed to exercise ordinary care to investigate and insure that positions such as operators and drivers of its front end loaders, which had the potential to cause an unreasonable risk to third parties, were only filled with qualified personnel.

83. Defendant was negligent in the hiring, training, instruction, and supervision of Mr. Nichols and that negligence was a proximate cause of this occurrence.

84. It was negligence on the part of Defendant to permit Mr. Nichols to operate a front end loader because Defendant knew, or should have known, that Mr. Nichols would use the vehicle in an unsafe manner that would create an unreasonable risk of harm to others, including Mr. Karnes.

85. As a direct result of Defendant's negligence (both direct and vicarious), Mr. Karnes suffered a crushed pelvis, and severe abdominal bleeding. After extensive surgeries, Mr Karnes passed away. Defendant is directly liable for its own negligence and is vicariously liable for the actions of its employee, Wayne Nichols.

86. Defendant's conduct, and that of its employee, was a substantial factor bringing about Mr. Karnes injury and death. The injuries sustained by Mr. Karnes were proximately and legally caused by Defendant's negligent conduct and resulted in his death. Defendant's negligent conduct was also the cause in fact of Mr. Karnes' injuries and death. Mr. Karnes' injury and death could have been reasonable foreseen or anticipated by a person or ordinary intelligence and care and thereby prevented with ordinary care.

**COUNT II. VII. ABSOLUTE LIABILITY - ULTRA HAZARDOUS ACTIVITY**

87. Plaintiff re-alleges and incorporates all allegations contained in Paragraph 1-86 above.

88. CHS did not provide Mr. Nichols with any type of monitoring or radio device that would allow him to communicate directly with Mr. Karnes or the other drivers. CHS also did not provide any employees to serve as spotters or signal persons in the CHS yard or to monitor the activity of CHS drivers, loaders, conveyors or other personnel or equipment.

17

89. This lack of safety devices and protocols caused Defendants' employees to drive Defendant's very large and dangerous front end loaders across areas of expected, and necessary, pedestrian traffic during times that Defendant's drivers would have a limited and restricted ability to view the area in their paths of travel. As such, Defendant's activities constitute ultra-hazardous activity as defined by law.

90. One engaged in an ultra-hazardous activity is responsible for injuries and damages legally caused by that activity even if he or she used the utmost care in carrying out the activity. By allowing its employee to operate the truck loader in the manner described above, Defendant engaged in an ultra hazardous activity from which absolute liability attaches for all damages sustained by Plaintiff which were proximately caused by the use of the truck loader.

91. The ultra hazardous activity engaged in by Defendant and its employee was the cause-in-fact and a proximate cause of the above described injury and death.

## DAMAGES

92. Plaintiff, Lora Crotzer as the Administrator of the Estate of Gaylon Ray Karnes, prays that she have and recover damages and judgment from and against the Defendant as compensation to the heirs and the beneficiaries at law of Mr. Karnes, for conscious mental and physical pain and suffering and emotional distress suffered by Mr. Karnes between the injury and his death, medical expenses necessitated by the fatal injury, reasonable funeral expenses, loss of earnings, loss of earning capacity during the period from injury to death, the present value of the loss of earnings capacity in the future for Mr. Karnes, the loss of future services to be rendered by Mr. Karnes, for mental anguish sustained by the surviving beneficiaries of the Estate of Mr. Karnes, for the loss of consortium suffered by the wife and children of Mr. Karnes, for the loss of life or the pecuniary value

of the life of Mr. Karnes; and for all other damages allowed by law.

93. Defendant knew or should have known in light of the surrounding circumstances, that its conduct would naturally and probably result in injury or damage, and Defendant continued the conduct with malice and in reckless disregard of the consequences from which malice might be inferred. Defendant intentionally pursued the course of conduct for the purpose of causing injury and that conduct did, in fact, harm Mr. Karnes. Defendant acted intentionally, recklessly, and/or maliciously. Accordingly, Plaintiff is entitled to punitive damages in an amount to be determined by the jury. In making this determination, the jury should consider the Defendant's net worth and financial condition, the objectionable nature of the Defendant's wrongdoing, the impact of the defendant's conduct on Mr. Karnes and the relationship of the parties. The jury should also consider the Defendant's awareness of the amount of harm being caused and the defendant's motivation in causing the harm. The jury should also consider the amount of money the plaintiff is required to spend in the attempt to recover the losses and whether Defendant profited from the activity. The jury should also consider the number and amount of previous punitive damage awards against the Defendant based upon the same wrongful act; and whether, once the misconduct became known to the defendant the defendant tried to remedy the situation or offered a prompt and fair settlement for the actual harm caused.

94. Pursuant to Ark. Code Ann. § 16-62-101(b), in addition to all other elements of damages provided by law, Plaintiff prays that she have and recover damages and judgment from and against Defendant, as compensation for Mr. Karnes' loss of life as an independent element of damages.

95. All damages recovered herein for the injuries, survival, death, and loss of life of Mr. Karnes should be distributed to the proper beneficiary and heirs in accordance with applicable law.

96. Plaintiff should have and recover judgment in an amount to be set by the jury in excess of the minimum amount required for federal court diversity from Defendant as compensatory damages for the injuries, wrongful death, survival, and loss of life of Mr. Karnes.

97. Plaintiff requests a jury trial.

98. Mr. Karnes left behind an elderly and disabled wife for whom he was the primary care giver. Due to her failing health and need for additional care, Plaintiff requests that this matter be expedited for both the purposes of discovery and trial.

WHEREFORE, the Plaintiff, Lora Crotzer, as Administrator of the Estate of Gaylon Ray Karnes, Deceased, prays that she have and recover against Defendant compensatory and punitive damages in an amount to be determined by a jury and all other fees and costs to which Plaintiff is entitled.

Respectfully submitted,

Chris A. Averitt #98123
Scholtens & Averitt, PLC
113 E Jackson Ave
Jonesboro, AR 72401
(870) 972-6900

Tony L. Wilcox #93084
Wilcox & Lacy, PLC
600 S. Main St.
Jonesboro, Arkansas 72401
(870) 933-3101

Attorneys for Plaintiff

By: _____
Chris A. Averitt (98123)